**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Daniel Speights, Appellant,

v.

Chubb Limited d/b/a Chubb National Insurance Company; Auto-Owners Insurance Company; and Bankers Standard Insurance Company, Defendants,

of which Auto-Owners Insurance Company is the Respondent.

Appellate Case No. 2023-001845

————————

Appeal From Hampton County
George M. McFaddin, Jr., Circuit Court Judge

————————

Unpublished Opinion No. 2026-UP-194
Submitted February 1, 2026 – Filed April 29, 2026

————————

**AFFIRMED**

————————

Algernon Gibson Solomons, III, of Solomons & Lawton, PC, of Estill, for Appellant.

Morgan S. Templeton and W. Richards Hundley, both of Wall Templeton & Haldrup, PA, of Charleston, for Respondent.

**PER CURIAM:** Daniel Speights (Appellant) filed this action against Auto-Owners Insurance Company (Owners) after it denied his claim for coverage following an unfortunate incident of wire fraud. The trial court granted summary judgment in favor of Owners, finding Appellant was not an insured under the policy and finding the policy excluded monetary transfers induced by fraud under the policy's "False Pretense" exclusion. Appellant argues ambiguities in the policy should have been interpreted in his favor, and summary judgment was premature because the parties had not completed discovery. We affirm.

## I.    FACTS

Appellant was an attorney with Speights & Solomon, LLC (Law Firm).[1] In September 2019, the Law Firm's bookkeeper received an email purportedly from Appellant asking her to wire $250,000 to a bank account in Hong Kong, China. Attached to the email was an invoice from "Hong Kong Shining Transport Co. Limited" requesting payment for "investment distributions and professional services rendered." The bookkeeper responded and asked if this wire was "DAS Personal?"[2] An email from Appellant's account stated, "Yes, let me know when done." Two days after she wired the funds from Appellant's personal bank account, the bookkeeper discovered that Appellant's email had been compromised and she had been corresponding with a hacker posing as Appellant. Appellant attempted to reverse the wire but was unable to recover any of the stolen funds.

Law Firm had a policy with Owners which excluded coverage for "[b]ullion, money, or securities." Law Firm purchased additional optional coverage to supplement the standard policy, including a "Money and Securities" endorsement and a "Forgery and Alteration" endorsement. Appellant submitted a claim to Owners, requesting coverage for his loss under the policy. Owners denied coverage. As a result, Appellant filed this action alleging negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing.

Owners moved for summary judgment arguing it did not act in bad faith in denying Appellant's claim because (1) the policy did not cover Appellant's personal bank account, and (2) the policy excluded monetary transfers induced by fraud under the

---

[1] Unfortunately, Appellant passed away while this case was on appeal.

[2] "DAS" referred to Appellant.

policy's False Pretense exclusion.   The trial court granted Owners' motion and this appeal followed.

## II.    LAW/ANALYSIS

"Insurance policies are subject to the general rules of contract construction." *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012) (quoting *M & M Corp. of S.C. v. Auto-Owners Ins. Co.*, 390 S.C. 255, 259, 701 S.E.2d 33, 35 (2010)).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  *Id.* (quoting *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009)).  "Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning."  *Id.* (quoting *USAA Prop. & Cas. Ins. Co. v. Clegg*, 377 S.C. 643, 655, 661 S.E.2d 791, 797 (2008)).

"Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect."  *Id.* at 615, 732 S.E.2d at 628 (quoting *McGill*, 381 S.C. at 185, 672 S.E.2d at 574).  "Whether the language of a contract is ambiguous is a question of law for the court."  *Auto-Owners Ins. Co. v. Benjamin*, 415 S.C. 137, 143–44, 781 S.E.2d 137, 141 (Ct. App. 2015).  "An insurance contract is read as a whole document so that 'one may not, by pointing out a single sentence or clause, create an ambiguity.'"  *Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 392 S.C. 506, 516, 709 S.E.2d 85, 90 (Ct. App. 2011) (quoting *Yarborough v. Phoenix Mut. Life Ins. Co.*, 266 S.C. 584, 592, 225 S.E.2d 344, 348 (1976)).  Further, this court must construe "[a]mbiguous or conflicting terms in an insurance policy . . . liberally in favor of the insured and strictly against the insurer."  *Whitlock*, 399 S.C. at 615, 732 S.E.2d at 628 (quoting *Clegg*, 377 S.C. at 655, 661 S.E.2d at 797).  When interpreting an insurance policy with an endorsement, the court must read the endorsement and policy together.  *Long v. Adams*, 280 S.C. 401, 405, 312 S.E.2d 262, 265 (Ct. App. 1984).  "The policy remains in full force and effect to the extent its terms are modified by the words of the endorsement.  If a provision of the policy conflicts with a provision of the endorsement, the latter controls."  *Id.* at 405–06, 312 S.E.2d at 265 (citation omitted).

"[T]he initial burden to prove that a loss is covered under an insurance policy is on the insured, and once the insured has done so, the burden shifts to the insurer to prove that an exclusion applies to defeat coverage."  *Ex parte Builders Mut. Ins. Co.*, 431 S.C. 93, 102, 847 S.E.2d 87, 92 (2020) (citing *Gamble v. Travelers Ins.*

*Co.*, 251 S.C. 98, 103, 160 S.E.2d 523, 525 (1968)).  "Insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability." *Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005).

It is within an insurer's right to place restrictions and exclusions on coverage so long as the exclusions "are not in contravention of public policy or a statutory [provision]." *B.L.G. Enter., Inc. v. First Fin. Ins. Co.*, 334 S.C. 529, 535–36, 514 S.E.2d 327, 330 (1999); *see also Auto Owners Ins. Co. v. Newman*, 385 S.C. 187, 197, 684 S.E.2d 541, 546 (2009) ("The standard CGL policy grants the insured broad liability coverage for property damage and bodily injury which is then narrowed by a number of exclusions.  Each exclusion in the policy must be read and applied independently of every other exclusion.").

## A. Are there ambiguities in the policy language that should be construed in favor of coverage?

Appellant first argues the Money and Securities Endorsement covering "any type of stealing" provides coverage for his loss, and any conflict between that endorsement and the policy's False Pretense exclusion created an ambiguity that should be resolved in his favor.  The Money and Securities Endorsement provides:

> a. We will pay for loss of money and securities used in your business while at a bank or savings institution, within your living quarters[,] or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places resulting directly from:
> **(1) Theft, meaning any act of stealing**;
> (2) Disappearance; or
> (3) Destruction.
>
> b. **In addition to the Limitations and Exclusions applicable to property coverage**, we will not pay for loss:
> (1) Resulting from accounting or arithmetical errors or omissions;
> (2) Due to the giving or surrendering of property in any exchange or purchase; or

(3) Of property contained in any money-operated device unless the amount of money deposited in it is recorded by continuous recording instrument in the device.

(emphases added).

The policy's property coverage excluded "loss or damage caused by or resulting from" false pretenses (the False Pretense exclusion). A false pretense is defined as the "[v]oluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense."

We find no ambiguity in the policy. The language of the Money and Securities endorsement expressly provides that all of the limitations and exclusions that apply to property coverage also apply to the Money and Securities endorsement. The False Pretense exclusion from the policy's property coverage section is therefore applicable to and limits the Money and Securities endorsement. Under the terms of the policy, Law Firm is therefore covered if someone breaks into the office and steals money, for instance, but not under these circumstances where an employee is tricked into voluntarily parting with Law Firm's funds.

Appellant next argues that his loss should be covered under the policy's Forgery and Alteration endorsement. To the extent the Forgery and Alteration endorsement conflicts with the False Pretense exclusion, he argues the ambiguity should be resolved in his favor. We disagree.

The Forgery and Alteration endorsement covers "loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange[,] or similar written promise of payment in 'money', that you or your agent has issued, or that was issued by someone who impersonates you or your agent." The forged email and invoice in this case, however, were *demands* for the payment of money and not promises of payment such as a check, draft, or promissory note. *See Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994) ("When words of particular and specific meaning are followed by general words, the general words are construed to embrace only persons or things of the same general kind or class as those enumerated."). Giving the words their plain and ordinary meeting, we do not believe that either the fake email or invoice can fairly be characterized as "promises of payment."

Appellant cites *Morris James LLP v. Continental Casualty Co.*, 928 F. Supp. 2d 816, 825 (D. Del. 2013), to support his assertion that the Forgery and Alteration endorsement and the False Pretense exclusion conflict. In *Morris*, the law firm deposited a client's fraudulent certified check and then followed the client's instructions to wire the funds to a third party. *Id.* at 819. After wiring the funds, the firm discovered the check was a forgery. The court found that the firm's fraud claim was covered under the policy where the forgery provision and false pretense exclusion were "susceptible to different reasonable interpretations, when read in tandem." *Id.* at 824. First, the court found the loss was covered by the policy's forgery provision, which covered

> (1) losses resulting directly from (2) the forgery or alteration of (3) "checks, drafts, promissory notes, or similar written promises, *orders or directions*" . . . (4) to pay a sum certain (5) that are "made or drawn by one acting as an agent or purported to have been so made or drawn."

*Id.* at 822–23. Although the loss was covered under the policy's forgery provision, the court found the loss was excluded under the policy's false pretense exclusion. *Id.* at 823–24. The court found the inconsistencies in the policy's provisions created an ambiguity that must be construed in favor of the coverage for the insured. *Id.* at 824.

*Morris* differs from the present case in two important ways. First, *Morris* dealt with a forged cashier's check, which was specifically covered under the endorsement's terms. The present case involves an emailed demand for payment, which is not covered by the terms of the endorsement. Second, the endorsement in *Morris* covered *orders or directions* to pay a sum certain; the Policy here only covers written *promises of payment*. Because the fraudulent email and invoice in this case were demands for payment, rather than promises of payment, we find the loss is not covered under the Forgery and Alteration Endorsement and there is no conflict between the policy provisions.[3]

---

[3] Appellant also makes a cursory argument that his losses are recoverable under the policy's "Identity Recovery" coverage. We find this issue is not preserved for appeal because it was not ruled on by the trial judge and was not raised in Appellant's Rule 59(e) motion. *See Chastain v. Hiltabidle*, 381 S.C. 508, 515, 673 S.E.2d 836, 829 (Ct. App. 2009) ("When an issue is raised to but not ruled upon by

## B. Does the "voluntary parting" language in the False Pretense exclusion render the provision ambiguous?

Appellant argues the False Pretense exclusion should not apply because the use of the term "voluntary" in the exclusion renders its meaning "non-sensical." Specifically, Appellant argues the bookkeeper's actions did not qualify as a voluntary transfer because "something is not voluntary if one is unaware of what one is doing." We disagree and find the court's holding in *Midlothian Enterprises, Inc. v. Owners Insurance Co.*, 439 F.Supp.3d 737 (E.D. Va. 2020), persuasive.

The court in *Midlothian* construed a similar false pretense exclusion, referred to in the case as a "voluntary parting exclusion." *Id.* at 739. In that case, the insured's employee received an email purportedly from the company's president asking her to wire funds to an Alabama bank account. *Id.* at 740. After the funds were transferred, she realized the president's email had been hacked and the email was fake. *Id.* As in this case, the insured's standard policy did not cover "money, notes[,] or securities[;]" however, the insured purchased an optional endorsement which provided coverage for loss of money and securities resulting from theft. *Id.* at 739. The endorsement, however, excluded "[l]oss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property." *Id.* at 739–40. The law firm's claim for insurance coverage for the lost funds was denied by the insurer, and the court upheld the denial. *Id*. at 744. The court found the voluntary parting exclusion applied because (1) the insured's employee "had the authority to make these types of transfers based on [the insured's] normal business practices, and [(2)] she freely transferred the money once she believed she received instructions to do so." *Id.* at 742. The court relied on *Martin, Shudt, Wallace, Dilorenzo & Johnson v. Travelers Indemnity Co. of Connecticut*, No. 1:13-CV-0498 LEK/CFH, 2014 WL 460045 (N.D.N.Y. Feb. 5, 2014), which similarly held the employee's decision to wire "money in reliance on misrepresentations or false pretenses does not alter the voluntariness of that parting." *Midlothian*, 439 F.Supp. 3d at 742 (quoting *Martin*, No. 1:13-CV-0498 LEK/CFH, 2014 WL 460045, at *3).

---

the trial court, the issue is preserved for appeal only if the party raises the same issue in a Rule 59(e) motion.").

We likewise find the "voluntary parting" language in the False Pretense exclusion here is not ambiguous. While the bookkeeper did not intend the unfortunate outcome that resulted, she did intend to wire the funds and did so voluntarily. *See Sphere Drake Ins. Co. v. Litchfield*, 313 S.C. 471, 474, 438 S.E.2d 275, 277 (Ct. App. 1993) ("While a policy should be liberally construed in favor of coverage and against exclusion, courts are not permitted to torture the ordinary meaning of language to extend coverage expressly excluded by the terms of the policy."); *see also Schmidt v. Travelers*, 101 F.Supp. 3d 768 (S.D. Ohio 2015) (finding that the fraudulent nature of a scheme "does not alter the voluntariness of the parting" with the money); *Schweet Linde & Coulson v. Travelers*, 2015 WL 3447242, at *3 (W.D. Wash 2015) ("[A company] parted with those funds through deliberate, intentional, and voluntary acts, even if it lacked perfect knowledge regarding the circumstances surrounding the transfers.").

### C. Was summary judgment premature?

Appellant argues summary judgment was premature in this case because (1) Appellant had not yet been deposed, (2) Owners' company representative was deposed only six days prior to Owners filing its motion for summary judgment, and (3) written discovery was still outstanding. We disagree. Appellant did not need to be deposed to submit his own affidavit to the court in opposition to Owners' motion, and he points to no other deposition or discovery which would have aided the court in interpreting the policy language. *See* Rule 56(c), SCRCP ("The adverse party may serve opposing affidavits not later than two days before the hearing."). Appellant cannot use his own failure to submit an affidavit to argue that summary judgment was premature. *See Dawkins v. Fields*, 354 S.C. 58, 69, 580 S.E.2d 433, 439 (2003) ("Summary judgment is a drastic remedy and must not be granted until the opposing party has had a full and fair opportunity to complete discovery. Nonetheless, the nonmoving party must demonstrate the likelihood that further discovery will uncover additional relevant evidence and that the party is 'not merely engaged in a "fishing expedition."'" (internal citations omitted) (quoting *Baughman v. American Tel. and Tel. Co.*, 306 S.C. 101, 112, 410 S.E.2d 537, 544 (1991)).

We also do not find persuasive Appellant's argument that summary judgment should not have been granted because the legal issues and facts of this case are novel in South Carolina. The interpretation of an insurance policy is typically a matter of law for the court. *See State Farm Mut. Auto. Ins. v. Goyeneche*, 429 S.C. 211, 217, 837 S.E.2d 910, 913 (Ct. App. 2019) ("When the purpose of the underlying dispute is to determine whether coverage exists under an insurance

policy, the action is one at law." (quoting *Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40, 46, 717 S.E.2d 589, 592 (2011))).  There were no relevant factual disputes in this case, and Appellant has not shown how additional discovery or the passage of time would change the court's legal analysis of the policy language.[4]

We need not address Appellant's remaining argument that the trial court erred in finding there was no coverage because the stolen funds came from Appellant's personal bank account, rather than the law firm's account.  Our finding that the False Pretense exclusion precludes coverage is dispositive.  *See Futch v. McAllister Towing*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address an issue when a decision on another issue is dispositive).

### III.   CONCLUSION

For the above reasons, the decision of the trial court is

**AFFIRMED.**[5]

**GEATHERS, HEWITT, and CURTIS, JJ., concur.**

---

[4] In addition, Appellant argues Owners' representative made a statement during his deposition that certain endorsements "may apply" to this claim, thus creating a material issue of fact as to whether coverage exists.  We disagree.  The interpretation of whether the policy language is applicable to a claim is an issue at law for the court.  *See Goyeneche*, 429 S.C. at 217, 837 S.E.2d at 913.  The agent's interpretation of the policy is not dispositive of whether there is coverage and does not create a factual dispute regarding the interpretation of the policy.

[5] We decide this case without oral argument pursuant to Rule 215, SCACR.